UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA M.[1], <br>     Plaintiff, <br> vs. <br> NANCY A. BERRYHILL, Acting Commissioner of Social Security, <br>     Defendant | 3:18-cv-03235-TSH <br><br> **ORDER RE: MOTION FOR SUMMARY JUDGMENT, MOTION FOR REMAND** <br><br> Re. Dkt. Nos. 20, 27 |

## I. INTRODUCTION

Plaintiff petitioned this Court seeking review of a final adverse disability determination by Defendant Acting Commissioner of Social Security, Nancy A. Berryhill, denying benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, et. seq. Upon reviewing the Administrative Law Judge's ("ALJ's") decision, the Commissioner offered to stipulate to remand the case pursuant to 42 U.S.C. § 405(g). Plaintiff rejected Defendant's proposal. Pending before the Court is Plaintiff's Motion for Summary Judgment, ECF No. 20, and Defendant's Motion to Remand, ECF No. 27. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court **GRANTS** Defendant's motion and **DENIES** Plaintiff's motion as moot.

## II. BACKGROUND

### A. Age and Work Experience

Plaintiff is 59 years old. AR 507. She graduated from high school but had no further

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

education. AR 80. Prior to the onset of her alleged disability she worked as a sales associate at clothing retailers. AR 64-66.

**B.      Medical Evidence**

    **1.      Consultative Examination by Dr. Sueng Ha Lim**

On July 19, 2013, Sueng Ha Lim, M.D., wrote his summary report of an internal medicine consultative examination he conducted of Plaintiff. AR 382-85. Dr. Lim described himself as a "[b]oard [e]ligible" in internal medicine. AR 385. Dr. Lim provided the following functional assessment: Plaintiff is restricted to standing and/or walking about six hours in an eight-hour workday with appropriate breaks; she can sit for six hours in an eight-hour workday with appropriate breaks; she can lift or carry 20 pounds occasionally and 10 pounds frequently; she does not have limitations on pushing, pulling and overhead reaching other than these weight limitations; and she can occasionally climb and stoop. *Id*.

Dr. Lim observed, among other things, Plaintiff's "slow gait [and] complaining of back pain," AR 383, and "pain on motion, paravertebral tenderness, and decreased range of motion of the back with 60/90 degrees of flexion, 20/25 degrees of extension, and 15/25 degrees of lateral bending to the right and left." AR 384. He observed "[p]eripheral pulses 2/4 and symmetrical throughout," "long arms and legs," "joints in the upper and lower extremities are flexible," "bunions on the feet," and "range of motion of the joints of the upper extremities and lower extremities is within normal limits, bilaterally." *Id*.

    **2.      Consultative Examination by Dr. Ognjev Petras**

On December 3, 2014, Ognjev Petras, M.D., saw Plaintiff for a consultative internal medical examination. AR 388-96. Dr. Petras is certified by the California State Medical Board as an internist. AR 396. By his assessment, Plaintiff "can stand and walk 2 hours out of an 8 hour work day"; she will "have to alternate sitting with standing/walking every 15-30 minutes"; "[s]he can reach and grasp in all directions and has normal fine fingering capabilities in both hands"; her "[l]ifting and carrying is limited to 10 pounds frequently and up to 20 pounds occasionally"; "[s]he can bend over occasionally, kneel and crawl occasionally, and squat occasionally"; and "[s]he has no communicative limitations. She has no sensory limitations. Environmental

limitations: she requires level terrain to ambulate safely and efficiently. She will benefit from a cane when walking more than 100 feet, but can walk short distances without a cane." AR 395-96.

Dr. Petras diagnosed Plaintiff with Ehler-Danlos Syndrome ("EDS"). AR 395. He noted that she has "some joint hypermobility and elbow/forearm pain related to Ehler-Danlos syndrome," "[l]ow back pain due to degenerative disease in the lumbar spine," "intermittent radiculopathy symptoms and some left sided sensation loss in the L5 and S1 dermatomes related to neural foraminal stenosis in her lumbar spine," and "[l]eft foot pain." *Id*.

In examining Plaintiff, Dr. Petras observed "tenderness to palpation over the right-sided lumbar paraspinal muscles," AR 392. He also noted "tenderness to palpation over the medial/lateral epicondyles of both elbows, and over the flexor tendons of both forearms." AR 393. Further, Dr. Petras observed "surgical scars over both great toes, and bilateral hallux valgus." *Id*. "Palpation over the plantar aspect of the left foot elicited neuropathic pain th[at] radiated from the foot to the left great toe." *Id.* Additionally, he wrote that her "[g]ait [] does not appear to be painful, but is somewhat wide-based. Claimant walked with a cane she held to her right, or in front of her while walking. Her posture was mildly stooped forward while walking. There was no obvious ataxia while she was walking. However, claimant walked at a slow pace only (while in the clinic, and while observed walking to the clinic from the clinic windows)." AR 394.

### 3. Consultative Examination by Dr. Randy Kolin

On December 4, 2014, Randy Kolin, Psy.D., conducted a "comprehensive mental status evaluation" of Plaintiff. AR 399-404. Dr. Kolin was not provided with any of Plaintiff's medical records in connection with his consultative examination of Plaintiff. AR 399. He was provided a copy of Plaintiff's Adult Disability Report (SSA Form 3368, AR 316-22). *Id.*

Dr. Kolin assessed Plaintiff's ability for abstraction as "adequate" but assessed her mental functions as impaired in the areas of attention and concentration, fund of knowledge, and memory for recently received information. AR 401. Dr. Kolin administered the WAIS-IV test to assess Plaintiff's cognitive abilities. *Id.* Plaintiff's verbal comprehension was "average." Her perceptual reasoning and working memory index were "low average." AR 402. Her processing speed was "Borderline." Her full-scale IQ of 86 was "low average." *Id.* Dr. Kolin administered the WMS-

3

IV test to assess Plaintiff's memory functions. AR 402-03. In all four areas of memory function tested (immediate memory, delayed memory, auditory memory and visual memory) Plaintiff's results were "low average." AR 403.

Dr. Kolin administered the Trail Making Test to assess the possibility of organic brain damage. *Id.* Plaintiff's scores did not indicate likely brain damage, but Plaintiff's Trail A score of 39 was one short of the 40 that does indicate a likelihood of brain damage. *Id.*

Dr. Kolin opined that from a psychological standpoint, Plaintiff had the following impairments of functional abilities: she is mildly limited in the ability to perform complex tasks, mildly limited in her ability to perform basic work activities and be safety conscious without special or additional instructions, mildly limited in the ability to maintain regular attendance, mildly limited in the ability to complete a normal workday without interruptions from psychiatric conditions, mildly limited in the ability to handle workplace stress, and moderately limited in the ability to accept instructions from supervisors and interact appropriately with fellow employees and customers. AR 404. Dr. Kolin stated that Plaintiff's "mental health symptoms may be chronic in nature" and "will not abate on [their] own within a one year period." *Id*.

### 4. Reports by Non-Treating, Non-Examining State Agency Physicians

#### a. Medical Assessments

Drs. Bradus and Clift[2] provided medical assessments at the initial and reconsideration stages, respectively. AR 208-09, 226-27. Both opined that Plaintiff had exertional, postural, and environmental limitations. AR 208-09, 226-27. They both concluded she could lift and carry 20 pounds occasionally and 10 pounds frequently; she could sit, stand or walk six hours in an eight-hour workday; she had no limits on balance and climbing and could occasionally stoop, kneel, crouch or crawl; she had no manipulative, communicative or visual limitations; and her only environmental limitation was to avoid concentrated exposure to fumes, odors, dusts and gases. AR 208-09, 226-27.

#### b. Mental Health Assessments

---

[2] The Social Security Administration did not identify the first names of its in-house medical personnel.

4

Drs. Ferrell and Morando provided mental health assessments at the initial and reconsideration stages, respectively. Dr. Ferrell identified anxiety as a mental health issue for Plaintiff. He stated that she had not undergone any psychiatric hospitalizations and was not on any psych medications. He noted she lives independently and takes care of household chores. He also noted her limited fund of knowledge, impaired recent memory and IQ of 85. AR 206. Dr. Morondo determined that no mental medically determinable impairments had been established for Plaintiff. AR 221-24

### 5. Report by Treating Physician Dr. Rachel Stern

Rachel Stern, M.D., of San Francisco General Hospital has been Plaintiff's treating physician since at least July 2014. AR 435. On June 9, 2015, Dr. Stern provided a treating medical source statement concerning Plaintiff's health. AR 514.

Dr. Stern identified the following objective clinical findings as support for the indicated diagnoses: "EDS exam - joint hypermobility, periodontitis, connective tissue disorder; Echocardiogram397-0, tricuspid valve; 780-2 syncope/collapse; 785.2 undiagnosed cardiac murmur; MRI 2002-L4-five bulge, tear, neural foraminal narrowing; L5-S1 central protrusion/tear, nerve root displaced." AR 513. Dr. Stern found that these objectively established medical conditions "support[ed] [the] complaint of pain, fatigue." *Id.* She stated that Plaintiff's complaints are supported by the underlying conditions because "chronic joint pain is 2/2 joint hypermobility, herniated lumbar disc, foot injury; dizziness, fatigue is 2/2, mitral valve disorder." *Id.* She further noted that Plaintiff's impairments would last longer than 12 months because Plaintiff "shows debilitating musculoskeletal manifestations, stiffness w/ progressive limitations of joint motion. EDS is a permanent, inherited, degenerative connective tissue disorder." *Id.* Dr. Stern identified the following as recommended treatment modalities: "low resistance exercise, diagnostic w/u, elbow, back braces, pain meds . . . and completed pain management counseling." *Id.* She opined that possible side effects of the proposed treatment program were: "physically challenging, muscle soreness, bruising and nausea." *Id.*

With regard to the limitations of physical functionality, Dr. Stern opined Plaintiff could lift or carry 10 pounds frequently; walk or stand one hour and sit two to four hours in an eight-hour

day and would require a change of position after standing for 5 to 10 minutes, walking for 15 minutes or sitting for 15 to 20 minutes; and should not bend, stoop, or climb because those types of activities exacerbate joint instability and pain and render Plaintiff's balance dangerously unstable. AR 514.

### 6. Report by Treating Physician Dr. Emily Thomas

Emily Thomas, M.D., of San Francisco General Hospital has been Plaintiff's co-treating physician since May 2016. AR 48. Dr. Thomas submitted a treating medical source statement concerning Plaintiff's impairments and their impact on her functionality. Based on her treating relationship with Plaintiff, Dr. Thomas opined that Plaintiff could not carry more than 10 pounds and that she could stand and walk about two hours a day and sit about four hours a day. She would need to change positions after 45 minutes of sitting or 10 minutes of standing and would require the opportunity to shift at will from sitting to standing and walking. AR 543.

Dr. Thomas identified limitations in reaching, handling and pushing/pulling because of connective tissue weakened by EDS that is "causing joint laxity and hypermobility." AR 544. She found environmental limitations of avoiding concentrated exposure to heat and cold and all exposure to fumes odors dusts gases etc. *Id.* She stated that Plaintiff "needs braces to prevent joint dislocation at her shoulders, elbows and knees." *Id*. Finally, she opined that Plaintiff's impairments would cause her to miss more than three days a month of work. *Id*. A November 15, 2016 treatment note by Dr. Thomas states, among other things: "Bilateral hallux varus: severe on exam. Likely will need repeat surgery. Reports neuropathic pain from prior surgery." AR 529.

By letter dated May 25, 2017, Dr. Thomas provided the following diagnostic history of Plaintiff:

> Ms. Theresa Plaintiff has been under my care since May 2016, and a patient at Zuckerberg San Francisco General Hospital since 2001. Ms. Plaintiff was first diagnosed with a valvular condition, Mitral Valve Prolapse, in 2000 that can contribute to shortness of breath and syncopal episodes. In 2011, Ms. Plaintiff was seen by our rheumatology clinic, who evaluated her for periodontal subtype of Ehlers Danlos Syndrome (EDS), and again in 2013, for recurrent gingi[v]al infections, high arched palate, joint hypermobility, and cardiac abnormalities. Ms. Plaintiff has been unable to perform strenuous manual labor that requires any lifting, crouching, or prolonged standing secondary to this condition since 2007. Since 2013, Ms. Plaintiff has been repeatedly evaluated and treated for EDS

> for joint hypermobility, dislocation, and resulting pain at our primary care clinic. She additionally undergoes close follow-up at our dental clinic for dental caries and gingival infections also related to her condition. Because of the burden of her disease, I support Ms. Plaintiff in her application for disability. Please feel free to contact me if you have any additional questions.

AR 48.

### III. SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

Plaintiff filed an application for Social Security disability benefits on January 7, 2010 alleging a disability onset date of November 13, 2007. AR 139. She amended her disability onset date to August 5, 2009. *Id.* On September 21, 2010, she filed a request for a hearing before an ALJ. *Id.* On November 30, 2011, Plaintiff had a hearing before an ALJ. AR 126. The ALJ issued an unfavorable decision on December 22, 2011. AR 123-132.

On February 9, 2012, Plaintiff filed a request for review with the Appeals Council. AR 141. The Appeals Council denied review on February 20, 2013. *Id.* Plaintiff sought review in federal court pro se. AR 139. On September 9, 2014, Magistrate Judge Donna M. Ryu granted summary judgment in favor of the Commissioner. AR 139-173. Plaintiff had argued she was disabled in part because of her EDS, but Judge Ryu declined to consider those arguments because the record did not contain evidence of this diagnosis. AR 169.

Plaintiff filed her application for benefits under Title II and Part A of Title XVIII on September 23, 2014 alleging an onset date of November 1, 2007. AR 291-92. The Social Security Administration ("SSA") issued a Title II decision denial notice and a Title XVI decision denial notice on February 4, 2015. AR 236-40, 241-45. Plaintiff requested reconsideration of the initial notice of denial on February 23, 2015. AR 231-33. The SSA issued a Title II reconsideration decision denial notice on August 7, 2015. AR 246-50; *see also* Court Transcript Index. Plaintiff requested review of the reconsideration denial by an ALJ on August 26, 2015. AR 234-35. ALJ Robert Milton Erickson held a hearing on March 9, 2017. AR 51-106. At the hearing the onset date was amended to December 23, 2011 after determining that Plaintiff would not be able to obtain benefits prior to the unfavorable decision issued December 22, 2011. AR 58-59. A Notice of Decision-Unfavorable was issued on May 4, 2017. AR 30-32.

## A. March 9, 2017 Hearing

At the hearing on March 9, 2018 the ALJ heard testimony from Plaintiff and a vocational expert.

### 1. Plaintiff's Testimony

#### a. Employment

Plaintiff testified she worked as a sales associate at Goodwill in 2002, which involved standing at a cash register, going onto the floor, and helping customers if asked. She testified that she would sometimes lift one or two suits at a time. She testified there was not a stool at the cash register. AR 62-63.

In 2004, after leaving her job at Goodwill, Plaintiff began working as a sales associate in a Liz Claiborne retail clothing and accessories store. AR 64. In addition to standing at the cashier counter, she would open boxes of clothing and accessories coming in to be sold and remove the products for stocking on shelves. AR 65. Some of the boxes weighed up to 100 pounds, but she didn't carry them when they weighed that much. *Id.* She was having difficulties due to EDS while working at Liz Claiborne, with it "getting harder and harder every day to be – – continue to be, you know, lifting things." AR 82. The job required standing almost all day. AR 67. Plaintiff testified that her employment with Liz Claiborne ended in 2007 when she was let go after aggravating an existing injury to her back. AR 68-69. Asked if she filed a workers' compensation claim for an injury arising out of her employment, Plaintiff testified "I didn't know I could do that." AR 69.

Plaintiff testified to receiving unemployment from 2008 through 2011 and living off of her savings since that time. AR 70. The ALJ stated there was a gap in her records from San Francisco general from December 2015 to November 2016 and wanted to know why Plaintiff had not seen any doctors at San Francisco General during that time, to which Plaintiff responded, "no, I did. I did almost every two to three months. I had a follow-up." AR 70. The ALJ indicated that he might ask for treatment notes from that period depending on "how important that is." AR 71. Plaintiff testified she did not work between Christmas 2011 through the date of the hearing. AR 60-61.

8

### b. Living Conditions

Plaintiff testified that around Christmas of 2011 she was living by herself. She had a stove but did not cook much because she doesn't know how. AR 71-72. She he could walk four to five blocks with difficulty slowly and with a stop to get her vegetables at a discount vegetable place. She also testified that her ability to walk was worse back in Christmas of 2011 due to bad infections and bacteria in her body due to her bad teeth from EDS. Her teeth were later taken out at the San Francisco General Hospital dental clinic. AR 74-75. She has problems climbing the steps of a bus when using public transport, can only stand for 10 to 15 minutes at the bus stop, and will not get on the bus unless there is a seat available. AR 76. She does not attend church or go to community events because it is too stressful and the standing and cold weather "gets right to my injury." AR 80.

### c. Ailments

She had surgery in 1982 for a bunion on top of her hammertoe. The surgery failed and the tendon "got weaker and weaker and weaker. So now I have a nerve on the bottom of my foot that I can't even touch, even when I try to wash it. But my large toe goes like – – pretty much 90 degrees." AR 84-85. "It's very painful now." AR 85. As to her left elbow, she described her symptoms as, "the tendons right here, in here, and both arms become excruciating -- the pain is excruciating, just from lifting -- even, just like a seven-pound bag of groceries is what I say; because that's about all I can lift." AR 86. She indicated she had fractured ribs or history of fractured ribs that she thinks may have happened when she was moving a rolling rack at Liz Claiborne. AR 88.

She testified the injury she had "in '91 with the L4-S1 and L4-5 of the spine, it pushes up into the neck, and, well, maybe I could do it right now but I have to continuously adjust my neck." *Id.* She went on to say "I have to pop it back in place. It's a 24/7—I have to continuously, even when I'm sleeping, I'm never sleeping. The most I think I can sleep for is about three to four hours before I'm woken up." AR 88-89.

She testified to having pain in her foot due to pinched nerves on the bottom of her feet. AR 89. In connection with her heart, she indicated that her mutated tricuspid from the EDS

9

caused her lightheadedness and dizziness when changing position from laying down to sitting and sitting to standing. AR 90.

### 2. Vocational Expert's Testimony

Malcolm Brazinski testified as the vocational expert at Plaintiff's hearing. AR 93. He testified that Plaintiff's past relevant work consisted of two distinct but similar occupations. AR 94.

Brazinski testified that Plaintiff's job with Goodwill fell under the occupational title "retail sales clerk, 290.477-014, semiskilled with an SVP of 3, and light physical demand." *Id*. Her job with Liz Claiborne fell under the occupational title "sales associate of women's clothing, 261.357-066, semiskilled with an SVP of 3 and light physical demand." *Id*.

Presented with a hypothetical individual who

> can lift or carry occasionally 20 pounds, frequently 10, and usually can stand or walk six hours of an eight-hour workday with normal breaks, and who can sit for six hours of an eight-hour workday with normal breaks. The individual can push or pull consistent with the lifting and carrying I just described with the bilateral upper extremities. The individual can lift, again with the upper extremities consistent with the lifting just described

the vocational expert opined that person could perform the jobs of either a retail sales clerk or a sales associate for women's clothing as performed in the national economy, but could not perform the sales associate job in the way she had previously performed it. AR 94-95.

Presented with a second hypothetical person who can,

> lift or carry occasionally 20 pounds, frequently 10. This individual can stand or walk only two hours of an eight-hour workday. In addition to that, if the individual has to walk more than 100 feet, the individual would have to use a cane, and while so walking, could use only one hand to lift or carry. In addition, apparently under any circumstance, with a cane or not, no walking on uneven terrain. Individual can sit for six hours of an eight-hour workday, but with the understanding the individual has to alternate between standing and walking and sitting. … The combination of standing and walking and sitting. So, … after two hours of standing and walking, the individual would have to have the opportunity to sit, and after two hours of sitting, the individual would have to have the opportunity to walk or stand. The individual can only occasionally stoop, crawl, crouch or kneel. The individual is cognitively capable of constant, simple, repetitive tasks, as well as constant detailed or complex tasks. Only occasional interaction with the public, coworkers or supervisors. The individual should avoid exposure to dust, fumes, odors, gases,

10

the vocational expert opined that such an individual would not be able to perform either the retail sales clerk or a sales associate for women's clothing as performed in the national economy because more than occasional interaction is inferred from the DOT frequent "talking and hearing" description. AR 96-97. The vocational expert testified that there would be no transferable job skills, "if we have a person with the limitations we just described [second hypothetical], age 55 , with the high school education, past work experience of the Claimant," primarily due to the occasional interaction limitation. AR 98. Similarly, he testified that with the absence rate identified by Dr. Stern (five days a month), there were no jobs available. AR 104.

## IV. STANDARD OF REVIEW

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted). "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)). The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). However, "where the evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's decision. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ. *Id.*

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error 'does not negate the validity of the ALJ's ultimate conclusion.'" *Id.* (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)). A court may not reverse an ALJ's decision because of an error that is harmless. *Id.* at 1111 (citing *Stout v. Comm'r, Soc. Sec.*

*Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)). "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

## V. DISCUSSION

### A. Framework for Determining Whether a Claimant Is Disabled

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[3] 20 C.F.R. § 404.1520. The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work." *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i), (b). Here, the ALJ determined Plaintiff had not engaged in substantial gainful activity from December 23, 2011 through her date last insured December 31, 2012. AR 36.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act. 20 C.F.R. § 404.1520(a)(4)(ii). If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that through the date last insured Plaintiff had the following severe impairments: degenerative disc disease, Ehlers-Danlos Syndrome with tricuspid valve thickening, and mitral valve prolapse. AR 36. The ALJ also determined that

---

[3] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

12

Plaintiff's other medically identified conditions (such as vision loss, bilateral hallux varus, right hand tightness, and left knee pain) were "nonsevere because these conditions either have been managed well with treatment, did not last or w[ere] not expected to last 12 months or more, or have not produced associated symptoms that would significantly limit the claimant's ability to do basic work activities." AR 37. In addition, he found that Plaintiff's medically determinable mental impairment of anxiety did not cause more than a minimal limitation in her ability to perform basic mental work activities and was therefore nonsevere. *Id*.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1 (the "Listing of Impairments"). 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, she is conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d). Here, the ALJ determined there was no medical evidence that documented listing-level severity for any physical impairment. AR 38.

Before proceeding to step four, the ALJ must determine the claimant's Residual Function Capacity ("RFC"). 20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms. 20 C.F.R. § 404.1545(a)(1). In assessing an individual's RFC, the ALJ must consider all the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere. 20 C.F.R. § 404.1545(e). Here, the ALJ determined Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b) except lift or carry occasionally 20 pounds, frequently 10, stand or walk six hours of an eight-hour workday, sit six hours of an eight-hour workday, occasionally stoop or crawl, and avoid extreme exposure to fumes, dust, and gases. AR 38-39.

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f). Past relevant work is work performed within the past 15 years that was substantial

gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant has the RFC to do his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4) (iv). Here, at step four, the ALJ found that through the date last insured Plaintiff was capable of performing past relevant work as a retail sales clerk and sales associate of women's clothing.

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g); 404.1560(c). The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, Subpt. P, App. 2. *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006). Here, the ALJ made no findings, having determined Plaintiff was capable of performing past relevant work. AR 42-43.

### B. The Parties' Arguments

Plaintiff argues in her motion that: (1) the ALJ's findings of non-severity as to her vision loss, bilateral hallux varus, right hand tightness, and left knee pain are factually and legally untenable, Pl.'s Mot. at 11; (2) the ALJ failed at step two to even mention several of Plaintiff's medical conditions, such as depressive disorder and her musculoskeletal issues, and failed to make findings as to whether they were severe or non-severe, *id.* at 12; (3) the ALJ's step three finding is "entirely defective on its face" because it is two sentences long, does not identify what listings he considered, and does not consider the combined impact of Plaintiff's impairments, *id.* at 12-13; (4) the ALJ committed multiple errors in weighing medical opinions, *id.* at 13; (5) the ALJ failed to provide legally valid reasons for disregarding the medical source statement by treating physician Dr. Stern, *id.* at 14; (6) the ALJ failed to provide legally adequate reasons for disregarding the treating source medical statement by Dr. Thomas, *id.* at 15; (7) the relative weighing of medical opinions by the ALJ ignored virtually all the relevant criteria established by the Commissioner, *id.* at 16; (8) the ALJ's disregard of Plaintiff's testimony was legally and factually baseless, *id.* at 18; (9) the ALJ's assessment of Plaintiff's RFC was riddled with errors, *id.* at 19; and (10) because the

ALJ's finding at step four was based on an erroneous RFC determination, it cannot be sustained, *id.* at 20. Plaintiff requests that the Court "[r]emand for immediate calculation of benefits" which she claims "is appropriate because if even a few of the limitations identified by either of the improperly discredited treating physicians are credited the vocational expert testified that there are no jobs available." *Id.* at 20.

Defendant offers no defense of the ALJ's decision, declining to respond to any of Plaintiff's arguments on the merits. Rather, following a review of the ALJ's decision, Defendant offered to stipulate to remand the case pursuant to sentence four of 42 U.S.C. § 405(g) "to enable the Commissioner to reevaluate the severity of Plaintiff's impairments and, if warranted, proceed with the subsequent steps of the sequential evaluation and consider both the medical and non-medical evidence." Motion to Remand, ECF No. 27, at 2.

**C. Disposition of This Action**

Neither side believes the ALJ's decision can be upheld. Accordingly, the only decision for this Court to make is whether to credit-as-true and remand for the calculation of benefits, or to remand for further administrative proceedings.

42 U.S.C. § 405(g) states that a district court "shall have power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, *with or without remanding the cause for a rehearing*." (emphasis added). Based on the plain language of the statute, "every Court of Appeals has recognized that in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits." *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014) (citing cases).

The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Id*. at 1020.

Here, the first of those three criteria has not been satisfied. Plaintiff's second argument (concerning the ALJ's failure to mention several of her medical conditions in the step two analysis) is an error of omission. Her third argument (that the ALJ's step three finding is defective on its face) is based in part on the ALJ's failure to identify what listings he considered and his failure to assess the combined impact of Plaintiff's impairments. These are also errors of omission. Her second and third arguments feed into her ninth argument because the ALJ's assessment of Plaintiff's RFC likewise gave no consideration to the medical conditions he did not consider or the also unconsidered combined impact of her impairments. And, of course, her tenth argument (that the ALJ's step four finding was based on an erroneous RFC determination) follows from the ninth. The net effect is that these errors of omission pervade the ALJ's analysis.

Because at least some of the claimed errors in the ALJ's decision are of omission, the record has not been fully developed, and further administrative proceedings would serve a useful purpose. To be clear, the errors of omission are *why* the Court is remanding for further proceedings, but they do not limit the scope of the remand. The ALJ is free to reconsider any other issues in his order, including the other arguments Plaintiff advanced in this Court.

In light of this remand, Plaintiff's motion for summary judgment is moot.

## VI. CONCLUSION

For these reasons, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Motion for Remand. This action is **REMANDED** to the Commissioner of Social Security for further proceedings.

**IT IS SO ORDERED.**

Dated: April 22, 2019

THOMAS S. HIXSON
United States Magistrate Judge